## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEBRA-ANN WELLMAN | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 05-279 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| THE DUPONT COMPANY | ) | PUBLIC VERSION |
| | ) | |
| Defendant. | ) | |

### DEFENDANT E. I. DU PONT DE NEMOURS AND COMPANY'S APPENDIX IN SUPPORT OF ITS OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

POTTER ANDERSON & CORROON LLP
Kathleen Furey McDonough (#2395)
Sarah E. DiLuzio (#4085)
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
(302) 984-6000
kmcdonough@potteranderson.com
sdiluzio@potteranderson.com

*Attorneys for Defendant E. I. du Pont de Nemours and Company*

Date: August 31, 2007

Public Version: September 4, 2007

## TABLE OF CONTENTS

Affidavit Of George P. Sabol In Support Of DuPont's Motion For Summary Judgment
Executed August 29, 2007 ................................................................................................A1

DuPont Dow Elastomers Certificate of Formation
(Sabol Aff. Exh. A).........................................................................................................A5

Excerpts from the DDE Limited Liability Agreement
(Sabol Aff. Exh. B) .........................................................................................................A8

DuPont Dow Elastomers / DuPont Service Level Agreement
(Sabol Aff. Exh. C) .......................................................................................................A23

Plaintiff's DuPont Dow Elastomers Pension Estimate
(Sabol Aff. Exh. D).......................................................................................................A37

Formation Agreement for DuPont Dow Elastomers, Section 13, Human Resources Philosophy
(Sabol Aff. Exh. E) .......................................................................................................A42

Principles for Employee Movement Between Owners and DuPont Dow, and
Principles Regarding Employment Offers by the Owners
(Sabol Aff. Exh. F).......................................................................................................A54

Organizational Charts For DuPont Dow Elastomers' Kalrez® Business, and
DuPont Dow Elastomers Human Resources Department
(Sabol Aff. Exh. G).......................................................................................................A58

Excerpts from DuPont Dow Elastomers People Leader Manual
(Sabol Aff. Exh. H).......................................................................................................A62

Affidavit Of Karen Cronin In Support Of DuPont's Motion For Summary Judgment Executed
August 29, 2007 ............................................................................................................A72

Plaintiff's DuPont Dow Elastomers 1996 W-2 Form and a 2001 Pay Stub
(Cronin Aff. Exh. A)......................................................................................................A75

Letter, dated February 6, 2002, from DuPont Dow Elastomers to Plaintiff
Regarding Variable Pay Awarded for 2001
(Cronin Aff. Exh. B) .....................................................................................................A78

Letter, dated August 26, 2002, from DuPont Dow Elastomers to Plaintiff Terminating Plaintiff's
Employment
(Cronin Aff. Exh. C) .....................................................................................................A80

Letter, dated July 12, 2002, from DuPont Dow Elastomers' Director of Human Resources
Advising that DDE is Not in a Position to Obtain Employment with DuPont for Plaintiff .......A83

Documents Related to Plaintiff's Applications for Two Positions with DuPont in 2002 ..........A84

Excerpts from Deposition of Debra-Ann Wellman
Taken December 6, 2006 ...............................................................................................................A93

815727/20120-339

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN     )
                          )
           Plaintiff,   )    C.A. No. 05-279 (SLR)
                          )
     v.                 )
                          )
THE DUPONT COMPANY     )
                          )
          Defendant.  )

### AFFIDAVIT OF GEORGE P. SABOL
### IN SUPPORT OF DUPONT'S MOTION FOR SUMMARY JUDGMENT

STATE OF DELAWARE     )
                        )   ss
COUNTY OF NEW CASTLE   )

I, George P. Sabol, being duly sworn, do depose and say as follows:

1.     I am employed by E. I. du Pont de Nemours and Company ("DuPont"), the defendant in this action, as a Manager of Accounting Policy. I submit this affidavit in support of Defendant's Motion for Summary Judgment. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would competently testify thereto.

2.     DuPont Dow Elastomers, LLC ("DDE"), formed on April 1, 1996 as a limited liability company under Delaware law, was a joint venture between DuPont and The Dow Chemical Company ("Dow"). DuPont and Dow each, directly or indirectly, had a fifty percent interest in DDE. A copy of DDE's Certificate of Formation is attached hereto as Exhibit A.

3.     DDE was governed globally by a members committee, the equivalent of a corporate board of directors. The DDE members committee was composed of two (2) representatives from Dow and two (2) from DuPont. With the exception of the position of the Chief Financial Officer ("CFO"), the senior management team of DDE, which managed its day-

to-day operations, was made up of individuals employed solely by DDE. At least one individual who served as CFO of DDE was a Dow employee, loaned to DDE. Members of DDE's senior management team were located in DDE's headquarters in Wilmington, Delaware. Relevant excerpts from the DDE Limited Liability Agreement are attached hereto as Exhibit B.

4.     DDE held title to significant assets, including DuPont and Dow's former elastomers businesses and the physical buildings and equipment at DDE plant sites. DDE purchased its own raw materials and marketed its own products. DDE established its own bank accounts and internal accounting functions. DDE purchased workers' compensation and other insurance policies and obtained a federal employer identification number. DDE was responsible for its own labor relations. DDE had its own Finance, Operations, Marketing, Legal, Human Resources, Customer Service and other departments.

5.     During the formation process for DDE, DuPont and Dow negotiated service agreements allowing payment for services rendered to DDE by DuPont or Dow, or by DDE to DuPont or Dow, at shared locations. DDE was billed for such services. DDE was not required to buy needed services from DuPont or Dow. Likewise, DuPont, Dow and DDE were each free to discontinue the provision of any services no longer desired.

6.     Such a service agreement was negotiated between DuPont and DDE whereby DDE paid DuPont for integrated health services for its employees, including use of an Employee Assistance Program ("EAP"). The DDE/DuPont Service Level Agreement is attached hereto as Exhibit C.

7.     In order to become employed by DDE, employees of Dow and/or DuPont were required to resign or retire and become solely employed by DuPont Dow Elastomers, LLC. DDE employees, including Plaintiff Debra-Ann Wellman, had their pension benefits transferred

**A2**

from their prior employer to DDE's pension plan. (Attached as Exhibit D is a Pension Estimate for Ms. Wellman indicating she was a participant in DDE's pension plan.) Although it duplicated the provisions of the DuPont plan, the DDE pension plan was independent of DuPont's plan and separately funded.

8.     The Formation Agreement for DDE specifically provided that employees of DDE should expect to spend their careers with DDE, and should not expect to return to their previous employment with DuPont or Dow. Attached as Exhibit E is Section 13 of the Formation Agreement for DDE, which sets forth its Human Resources philosophy.

9.     Furthermore, employees resigning from DuPont in order to join DDE were not promised re-employment with DuPont. On the contrary, DuPont and Dow agreed that transfers between companies would be the exception and would be permitted only with the approval of DDE's senior leadership team and consistent with DDE's business needs. Attached as Exhibit F are "Principles for Employee Movement Between Owners and DuPont Dow" and "Principles Regarding Employment Offers by the Owners."

10.     DuPont played no part in daily employment decisions regarding DDE employees, nor was DuPont kept informed of those decisions. DDE employees were always supervised and managed by individuals employed by DDE. Employment decisions regarding DDE employees were made by DDE management in consultation with DDE's Human Resources Department. Attached as Exhibit G are organizational charts for DDE's Kalrez® business (in which Ms. Wellman worked during the relevant time period) and the DDE Human Resources department.

**A3**

11.    Finally, DDE developed its own separate employee policies including a "People Leader Manual." Attached as Exhibit H are excerpts from that Manual specifically related to the termination and conflict resolution processes.

_George P. Sabol_
George P. Sabol

Subscribed and sworn to before me on this 29th day of August, 2007.

_Juliann A. Barry_
Notary Public

My commission expires: _____

811987

JULIANN A. BARRY
Notary Public - Delaware
My Commission Expires Aug. 9, 2010

4

**A4**

# EXHIBIT A

*State of Delaware*                    PAGE   1

*Office of the Secretary of State*

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF LIMITED LIABILITY COMPANY OF "DUPONT
DOW ELASTOMERS L.L.C.", FILED IN THIS OFFICE ON THE SIXTEENTH
DAY OF JANUARY, A.D. 1996, AT 12:30 O'CLOCK P.M.

*Edward J. Freel, Secretary of State*

2564121  8100                    AUTHENTICATION:        7791702

960012618                        DATE:
                                            01-17-96

CONFIDENTIAL

A6

CERTIFICATE OF FORMATION

OF

DUPONT DOW ELASTOMERS L.L.C.

This Certificate of Formation of DuPont Dow Elastomers L.L.C. (the "Company") is being executed by the undersigned for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

(a) The name of the Company is DuPont Dow Elastomers L.L.C.

(b) The address of the registered office of the Company in Delaware is 1209 Orange Street, Wilmington, Delaware 19801. The Company's registered agent at that address is The Corporation Trust Company.

(c) The Company may dissolve upon the Bankruptcy of a Member or upon the mutual agreement of the Members

(d) The supervisory management of the Company is vested in Member Representatives. However, no Member Representative acting individually shall be the agent of the Company or shall have authority to bind the Company, and no debt shall be contracted or liability incurred by or on behalf of the Company, except by the Member Representatives acting collectively as provided in the Company's Limited Liability Company Agreement, as the same may be amended from time to time, or by one or more officers of the Company acting pursuant to the authority granted them under such Agreement or by the Members Committee

IN WITNESS WHEREOF, the undersigned, an authorized person of the Company, has caused this Certificate of Formation, which shall become effective on 16 January, 1996, to be duly executed as of the __16th__ day of January, 1996

Authorized Person     PRESIDENT DESIGNATE

CONFIDENTIAL

A7

# EXHIBIT B

# REDACTED IN ITS ENTIRETY

# EXHIBIT C

# REDACTED IN ITS ENTIRETY

# EXHIBIT D

JUL. 18. 2002  9:41AM   302-792-4382                          NO. 3387   P. 1



DuPont Connection
P.O. Box 438
Little Falls, NJ 07424-0438
1-800-775-5955

DEBRA-ANN WELLMAN          3850          **DuPont Dow**
PO BOX 4395                              Date Produced:        July 15, 2002
WILMINGTON DE 19807                      Social Security Number:

                                                               **REDACTED**

## PENSION ESTIMATE PACKAGE

This package is in response to your recent request for an estimate of your pension benefit under the DuPont Dow Pension and Retirement Plan.

This package contains:

- **Pension Calculation Statement** which shows your estimated pension benefits under each of your available payment options.
- **Explanation of Pension Benefit Options** which explains each of the pension benefit payment options available to you.

References to any of these forms will be in **bold.**

You are under consideration for Incapability Retirement or have specifically requested an estimate of Incapability Retirement benefits. The estimated benefits and payment options described in this package are available only if you actually qualify for Incapability Retirement.

A pension estimate is designed to help you determine your pension eligibility, estimated benefit and payment options as of a specific future separation date, and to help you decide when is the most appropriate time for you to retire or commence your benefits. You will need a Retirement/Benefit Commencement Package in order to commence your benefits. If you will be eligible to commence benefits immediately after your separation date, you must call DuPont Connection no more than 90 days before your separation date to request a Retirement/Benefit Commencement Package. This package will explain your benefit options and the steps you must take to begin your benefits. You must make your retirement/benefit commencement elections, submit the required paperwork, and notify your local Human Resources Representative of your intent to retire before your separation date. If you will not be eligible to commence benefits immediately after your separation date, you must request a Retirement/Benefit Commencement Package no more than 90 days before your benefit commencement date in order to begin your vested benefits.

If you have foreign service with the Company and are eligible for a foreign benefit, your U.S. pension benefit will be reduced by the U.S. dollar equivalent of your foreign pension. For information about applying for foreign benefits, please contact the Social Security Administration at 1-800-772-1213.

Review the information in this package carefully. It was created using information on file at DuPont Connection and information you provided when you called DuPont Connection to request this estimate. If you have any questions or if any of the information included in this package is incorrect, please call DuPont Connection at 1-800-775-5955 between the hours of 9 a.m. and 6 p.m., Eastern Time, Monday through Friday, to speak with an Employee Service Representative.

**A38**

JUL. 16. 2002  9:42AM    302-792-4382                          NO. 3387   P. 2



                                                              DuPont Dow

## PENSION CALCULATION STATEMENT
## (ESTIMATE PACKAGE)

                                                  Date Produced: July 15, 2002

### PERSONAL INFORMATION

Name:                    DEBRA-ANN WELLMAN   Date of Birth:        November 13, 1951
Social Security Number:              ***-**- REDACTED

### GENERAL INFORMATION

This statement shows your estimated pension benefits under each of the payment options available to you. Calculations are based on information you provided and data contained in our records. This estimate assumes continued service with the Company with no employment changes until your estimated separation date of 7/31/2002. Since you are still working, we have used your current rate of compensation and the compensation projection rate you specified at the time you requested this estimate to calculate your estimated pension earnings through the separation date you indicated.

Please note: The benefit amounts shown on the following pages are estimates only and may differ from your actual retirement benefits. See the Explanation of Pension Benefit Options included in this package for a brief description of each option.

### INFORMATION YOU PROVIDED WITH YOUR REQUEST ON 7/15/2002

Separation Date:                  7/31/2002   Estimate Request Date:        7/15/2002
Compensation Projection Rate:          0%

### INFORMATION FROM OUR RECORDS

Original Hire Date:               9/11/1979   Benefit Commencement Date (BCD):   8/1/2002
Adjusted Service Date:             4/5/1986   Earliest BCD:                      8/1/2002
Benefit Service at Separation:   16.32222   Earliest Unreduced BCD:            8/1/2002
Vesting Service at Separation:   17.94722   Normal Retirement Date:           11/13/2016
Age at Separation:               50.71667

Average monthly compensation: High 36 consecutive months

| Year | Total Compensation | # Of Months Used | Pension-Based Earnings Used |
|------|--------------------|------------------|-----------------------------|
| 1999 | $52,298.00 | 12.0000 | $52,298.00 |
| 2000 | $59,418.00 | 12.0000 | $59,418.00 |
| 2001 | $58,854.00 | 12.0000 | $58,854.00 |
| Total |  | 36.0000 | $170,570.00 |

Average Monthly Compensation: $4,738.06

### PENSION BENEFIT

The benefit formula used to calculate your pension is:

A = 1.2% of Average Monthly Compensation X Benefit Service

Based on the information listed above, your gross monthly pension payable at 8/1/2002 is:     $928.03

Total Offset:                                                                                  $0.00

Monthly benefit payable at 8/1/2002:                                                         $928.00

                                                                                              A39

JUL. 18. 2002   9:42AM     302-792-4382                                    NO. 3387   P. 3

## MONTHLY BENEFIT PAYABLE TO YOU FOR YOUR LIFETIME

| Pension Benefit Options | Starting 8/1/2002 |
|---|---|
| 1. Pension Benefit | $929.00 |

## MONTHLY BENEFIT PAYABLE AFTER YOUR DEATH TO YOUR SURVIVOR(S) FOR THEIR LIFETIME

| Survivor Benefits Under Pension Benefit Options | Total Survivor Benefits ‡ | Company-Paid Benefit To Beneficiary(ies) † |
|---|---|---|
| 1. Pension Benefit | $387.00 | $387.00 |

‡ This total is equal to the Company-Paid Survivor Benefit payable to your survivor(s) after your death.

† The Company-Paid Survivor Benefit is divided equally among your minor children until the age of 21.

The Investment Return Rate used in your pension calculation was 5%.

## INCAPABILITY SUPPLEMENT

Since you have requested an estimate of benefits under Incapability Retirement, you may be eligible for a monthly incapability supplement of $325.00 if you are not awarded a Social Security Disability benefit. This supplement would be payable to you every month starting on 8/1/2002 and ending when you either begin receiving a Social Security Disability benefit or reach age 62, whichever occurs first. You would be required to notify DuPont Connection if you retire under the Plan's Incapability provision and are awarded Social Security Disability benefits.

**A40**

JUL. 18. 2002  9:42AM    302-792-4382                                  NO. 3387   P. 4



## EXPLANATION OF PENSION BENEFIT OPTIONS (ESTIMATE PACKAGE)

DuPont Dow

**DuPont Dow Pension and Retirement Plan**                    Date Produced: July 15, 2002

The DuPont Dow Pension and Retirement Plan provides specific payment options for your retirement benefits which are described below. Please read the following before making your pension elections. For more information, see your Summary Plan Description or call DuPont Connection at 1-800-775-5955.

Your pension benefit automatically includes a **Company-Paid Survivor Benefit** regardless of which option you select. The Company-Paid Survivor Benefit is payable after your death to your eligible survivor(s).

### PENSION BENEFIT

If you are single, this is the standard form of payment.

This option provides you a monthly payment for your lifetime. Upon your death, a **Company-Paid Survivor Benefit** is payable to your designated eligible survivor(s). Your eligible survivors are your spouse, your minor children or a parent or stepparent. If you designate your spouse, your parent or your stepparent as your beneficiary, the survivor benefit is payable in full to your primary beneficiary for his or her lifetime. However, if you designate a child or children under the age of 21 as your beneficiary(ies), the survivor benefit is divided into equal shares and each share is payable to the respective child until he or she reaches age 21. If you designate your spouse and all or specified minor children, initially the survivor benefit would be paid to your spouse for his or her lifetime. If, upon your spouse's death, there remained a designated child or children under age 21, the survivor benefit would be divided equally and each share paid to the respective child until he or she reaches age 21.

If you are married, you may select this option only if your spouse completes the **Spousal Waiver** section of the **Spouse Benefit Option/Company-Paid Survivor Beneficiary Designation Form**. If your spouse completes the Spousal Waiver section, you may specify any eligible survivor(s) to receive the Company-Paid Survivor Benefit.

### PENSION BENEFIT WITH SPOUSE BENEFIT OPTION (SBO)

If you are married, this is the standard form of payment.

This option provides you a monthly payment for your lifetime, reduced to reflect the cost of the SBO benefit for your spouse. This benefit reduction is impacted by your age when your benefit begins and the difference between your age and your spouse's age.

Upon your death, your spouse will receive for his or her lifetime:

    a) The **SBO Benefit**, which is approximately 10% of your retirement benefit, and
    b) The **Company-Paid Survivor Benefit**.

When your spouse dies, the SBO benefit will stop and the Company-Paid Survivor Benefit will be paid in equal shares to your child(ren) until they reach age 21, if you have designated your child(ren) as beneficiary(ies).

If you do not want your pension reduced to provide the additional SBO benefit to your spouse, your spouse must complete the Spousal Waiver section of the **Spouse Benefit Option/Company-Paid Survivor Beneficiary Designation Form**. If your spouse completes the Spousal Waiver section, you may select any other option which does not provide an SBO survivor benefit. The Company-Paid Survivor Benefit will still be available; you may specify any eligible survivor to receive the benefit. Your eligible survivors are your spouse, minor children, or a parent or stepparent.

Only married participants are eligible for the Spouse Benefit Option. The Pension Calculation Statement enclosed in this package does not illustrate monthly payment amounts payable under this option because you did not specify a spouse's date of birth at the time of your request. If you would like to see this option illustrated, please call DuPont Connection and request another estimate.

A41

# EXHIBIT E

# REDACTED IN ITS ENTIRETY

# EXHIBIT F

# REDACTED IN ITS ENTIRETY

# EXHIBIT G

# REDACTED IN ITS ENTIRETY

# EXHIBIT H

# Termination Process

When we are considering terminating a person's employment with DuPont Dow, we owe it to the individual and to the Company to ensure that we treat the person fairly and with respect throughout the process. Our actions must be consistent with our Core Values and Cultural Elements, as well as all applicable laws.

## *Guidelines*

In cases of termination for poor performance or misconduct:

- Each region will establish and document its own specific procedures for terminations.
- The Director - Human Resources and General Counsel must be informed in advance of all terminations.
- You must discuss each case with your HR Manager/Consultant
- People whose termination is under consideration must be given a full explanation as to why—before any final action is taken—so that they may bring forward all relevant information.
- Each location must have an established, non-threatening avenue of appeal. Everyone must be made aware of its existence prior to the disciplinary decision being made, or at the time the decision is communicated.

**A63**

Last Edited 8/05/02

## Process Flow

### 1. You decide to recommend termination

- Consult with your manager and with your Human Resources Manager/Consultant
- Gather all relevant information from the employee
- In acute cases, consider sending the employee home, pending a decision

### 2. You convene a termination review

- Consultation group includes Legal, VP of terminating organization where appropriate, terminating manager, and the Human Resources Manager/Consultant
- The group will consider the background of the case, the employee's prior performance and service, and any other relevant issues
- The group will ensure that all local laws/labor procedures are being followed
- The final recommendation rests with the People Leader and should be made based on the consultation group's advice and considering the relevant issues.

The terminating People Leader will present his/her recommendations, including all relevant documentation.



NO

3. Recommendation Supported?

4. You continue managing problem performance, incorporating feedback from the consultation group.

YES

4. Proceed with termination

# Conflict Resolution Process

Performance issues are rarely simple, and any two people may have different perspectives on a given matter. Our attempts to coach and counsel people on performance will be most productive if we make every effort to listen to their views. Quite simply, we want all people to be able to discuss their performance from their own perspective and for them to be truly heard.

The process below is available to all employees. Our intent is that employees approach people in the order described below. Thus, employees should raise any concerns that they have first and foremost with their People Leaders, and only when that approach has failed should they consider use of the Avenue of Appeal. Those who attempt to pursue an appeal outside of this process will be directed back to it

> Our goal is to create a "win-win" solution that enables the employee to meet the role expectations while allowing the Company to maintain its performance standards.

## Avenue of Appeal

| | |
|---|---|
| Direct People Leader | • Whenever possible, employees should attempt to work directly with their immediate People Leader. This person typically has the most thorough understanding of the situation and assignment expectations. |
| Next Level Management | • When the issues cannot be resolved with the direct People Leader, the employee can go to the next level of line management or the Site Leader. |
| Human Resources | • Individuals can turn to their local Human Resources Manager/Consultant at any time without the approval of Site Leadership. The Human Resources Manager/Consultant will attempt to resolve the issue in the most appropriate and effective manner, considering the needs of both the employee and the Business/Work Process. |

NOTE:

   People wishing to report issues pertaining to the Company's Business Ethics Policy may contact the General Counsel or Chief Financial Officer at any time.

**A65**

Last Edited 8/05/02



## Policies, Procedures, & Manuals
### GLOBAL HR PROCEDURES & INFO

## DUPONT DOW ELASTOMERS L.L.C.

### 2.1 Sexual Harassment

Our employees' personal safety and dignity and their ability to perform their jobs effectively, without distractions and interference, are of prime concern to DuPont Dow. The company considers it essential to provide a safe, professional, productive and non-threatening work environment. It is DuPont Dow's policy that all employees have a right to work in an environment free of sexual harassment. The company will not tolerate sexual harassment of its employees in any form. All employees must avoid offensive or inappropriate sexual and/or sexually harassing behavior at work. Line management is responsible for ensuring that the workplace is free from sexual harassment.

Specifically, the company prohibits the following:

- Unwelcome sexual advances;

- Requests for sexual favors, whether or not accompanied by promises or threats with regard to the employment relationship;

- Other verbal or physical conduct of a sexual nature made to any employee that may threaten or insinuate that any employee's submission to or rejection of sexual advances will in any way influence any personnel decision regarding that person's employment, evaluation, wages, advancement, assigned duties, shifts or any other condition of employment or career development;

- Any verbal or physical conduct that has the purpose or effect of substantially interfering with the employee's ability to do his or her job; and

- Any verbal or physical conduct that has the purpose or effect of creating an intimidating, hostile or offensive working environment.

Such conduct may result in disciplinary action up to and including dismissal.

Other sexually harassing conduct in the workplace, whether physical or verbal, committed by supervisors or non-supervisory personnel is also prohibited. This behavior can include but is not limited to: commentary about an individual's body; the use of sexually degrading words to describe an individual; offensive comments; off-color language or jokes; innuendoes; and sexually suggestive objects, books, magazines, photographs, cartoons or pictures.

Employees who have complaints of sexual harassment by anyone at work, including any supervisor, co-employee, customer, client or other business associate, should act immediately and report such conduct to their supervisor so that the company may investigate and resolve the problem. If the complaint involves the employee's supervisor or

A66

investigate and resolve the problem. If the complaint involves the employee's supervisor or someone in the direct line of supervision, or if the employee for any reason is uncomfortable in dealing with his or her immediate supervisor, the employee may go to any another supervisor or directly to Human Resources.

The company will endeavor to investigate all complaints as expeditiously and as professionally as possible. Where investigations confirm the allegations, appropriate corrective action will be taken.

The company will make every attempt to keep the information provided to it in the complaint and investigation process confidential to the fullest extent permitted by the circumstances.

Retaliation against employees for reporting sexual harassment or assisting the company in the investigation of a complaint is against the law and will not be permitted. Retaliation can include but is not limited to such acts as: refusing to recommend an employee for a benefit for which he or she qualifies; spreading rumors about the employee; encouraging hostility from co-workers; and escalating the harassment.

Content Editor: Pat Bowhall                          Last Update: 01/27/2000 15:53:40
URL of this page: http://www1.dupont-dow.com/policies/HR/2-1_sexualharassment.html



DuPont Dow elastomers

A67




## Policies, Procedures, & Manuals

### GLOBAL HR PROCEDURES & INFO

## DUPONT DOW ELASTOMERS L.L.C.

## 2.2 Harassment

**PRINCIPLE:**

Our company will not tolerate the harassment of any employee--whether the initiator is another DuPont Dow Elastomers employee, customer, client, or other business associate. Our employees' personal safety and dignity and their ability to perform their jobs effectively, without distractions and interference, are of prime concern. Therefore, it is essential to provide a safe, professional, productive and nonthreatening work environment.

**GUIDELINES:**

* It is the responsibility of the employee to immediately report suspected cases of harassment to their local line organization or site and/or Company Human Resources.

* All instances of harassment will be handled with a strict "need to know" confidentiality, and the privacy of all parties involved will be respected, to the extent possible.

* All harassment complaints will be investigated thoroughly and promptly by line supervision or site and/or Company Human Resources, and appropriate action will be taken.

* Harassment can include but is not limited to:

  1. Racially oriented jokes, skits or remarks.
  2. Mimicking mannerisms in a demeaning manner.
  3. Demeaning behavior or use of overly familiar labels.
  4. Pranks.
  5. Overt discriminatory practices.
  6. Exclusion or isolation.
  7. Repeated flirtation, advances, or propositions.
  8. Offensive or inappropriate touching or behavior.
  9. Physically intimidating or threatening behavior.
  10. Obscene letters and calls.
  11. Obscene, offensive jokes, gestures, or suggestions.
  12. Ignoring, or not taking seriously, an employee who complains about harrassment.

**A68**

Dupont Dow Elastomers/Policies, Procedures & Manuals - Global Hum...: Corporate Ethic   Page 2 of 2

Content Editor: Pat Bownall                    Last Update: 01/27/2000 15:55:54
URL of this page: http://www1.dupont-dow.com/policies/HR/2-2_harassment.html

Dupont Dow elastomers

**A69**





### GLOBAL HR PROCEDURES & INFO

## DUPONT DOW ELASTOMERS L.L.C.

## 2.3 Employee Conduct and Work Rules

### 2.3 PRINCIPLE:

To ensure orderly operations and provide the best possible work environment for all employees, it is expected that employees will follow rules of conduct that will protect the interests and safety of all employees and the organization.

### 2.3 POLICY:

As it is not possible to list all forms of behavior that are considered unacceptable in the workplace, the following are examples of misconduct that may result in disciplinary action, up to and including termination of employment.

1. Violations of safety rules, practices or policies.
2. Dishonesty.
3. Engaging in hostile, abusive, threatening, or disrespectful behavior or gestures while engaged in activities on behalf of the Company, including physical or mental intimidation, threats, or other forms of harassment.
4. Falsification of timekeeping or any company records, including the giving of false information when hired.
5. Engaging in a fight in the workplace or on site property or in activity that could provoke fighting.
6. Reporting to work under the influence of drugs or alcohol.
7. Use or possession of weapons, ammunition, explosives, intoxicants, alcohol, illicit drugs or narcotics on site property.
8. Insubordination, including deliberate refusal to comply with reasonable requests or instructions.
9. Unauthorized absence from work.
10. Conduct which violates common decency or morality.
11. Horseplay, or malicious mischief on site property.
12. Theft, unauthorized possession/removal, or attempted removal of company property, or property belonging to employees, contractors, vendors, or visitors.
13. Misuse of company proprietary information.
14. Sleeping during working hours.
15. Intentional damage to Company, employee, contractor, or vendor property.
16. Bringing "strike anywhere" matches on a manufacturing site, or having any type of match, cigarette lighter or flame-producing device in restricted areas.
17. Smoking except in designated "smoking" areas.
18. Use of Company electronic communications resources (email, internet access, desktop/laptop/mainframe computers, servers, networks, plant and laboratory automation and process control equipment) which violates DuPont Dow's core values and policies, including such things as sexual, racial or other types of harassment and discrimination, and access to sexually-oriented and other inappropriate material.

Content Editor: Pat Bowhall                    Last Update: 09/17/2002 16:05:59
URL of this page: http://www1.dupont-dow.com/policies/HR/2-3_empconduct.html

**A70**

investigate and resolve the problem. If the complaint involves the employee's supervisor or someone in the direct line of supervision, or if the employee for any reason is uncomfortable in dealing with his or her immediate supervisor, the employee may go to any another supervisor or directly to Human Resources.

The company will endeavor to investigate all complaints as expeditiously and as professionally as possible. Where investigations confirm the allegations, appropriate corrective action will be taken.

The company will make every attempt to keep the information provided to it in the complaint and investigation process confidential to the fullest extent permitted by the circumstances.

Retaliation against employees for reporting sexual harassment or assisting the company in the investigation of a complaint is against the law and will not be permitted. Retaliation can include but is not limited to such acts as: refusing to recommend an employee for a benefit for which he or she qualifies; spreading rumors about the employee; encouraging hostility from co-workers; and escalating the harassment.

---

Content Editor: Pat Bowhall                    Last Update: 01/27/2000 15:53:40
    URL of this page: http://www1.dupont-dow.com/policies/HR/2-1_sexualharassment.html

DuPont Dow elastomers

**A71**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN                )
                                 )
                    Plaintiff,   )        C.A. No. 05-279 (SLR)
                                 )
        v.                       )
                                 )
THE DUPONT COMPANY               )
                                 )
                    Defendant.   )

## AFFIDAVIT OF KAREN R. CRONIN
## IN SUPPORT OF DUPONT'S MOTION FOR SUMMARY JUDGMENT

STATE OF DELAWARE        )
                         )      ss
COUNTY OF NEW CASTLE     )

I, Karen R. Cronin, being duly sworn, do depose and say as follows:

1.      I am employed by DuPont Performance Elastomers, LLC as a Human Resources

Consultant. DuPont Performance Elastomers is the successor to DuPont Dow Elastomers, LLC

("DDE"), a joint venture that was formed between E. I. du Pont de Nemours and Company

("DuPont") and The Dow Chemical Company ("Dow"). I submit this affidavit in support of

DuPont's Motion for Summary Judgment. I have personal knowledge of the facts set forth

herein and, if called as a witness, could and would competently testify thereto.

2.      Prior to my current employment with DuPont, I was employed by DDE as a

Human Resources Consultant. I held that position from November, 1999 until June 30, 2005,

when DuPont purchased Dow's interest in DDE and DDE became DuPont Performance

Elastomers, LLC.

3.      Plaintiff Debra-Ann Wellman was employed by DuPont prior to April 1, 1996.

On that date, however, she resigned her position with DuPont and accepted an offer of

employment with DuPont Dow Elastomers, LLC. Ms. Wellman remained an employee of DDE

for seven years, until her termination from that company on August 26, 2002. During her

employment with DDE, Ms. Wellman's wages were paid solely by DDE. Attached here as

Exhibit A are copies of Ms. Wellman's W-2 form for the year 1996 and pay stub for the year

2001 when she was employed by DDE.

      3.      In addition to her salary, as a DDE employee Ms. Wellman was eligible to

participate in DDE's Variable Pay Plan, which allowed her to earn additional compensation

based upon the performance of DDE's business units. Attached as Exhibit B is a copy of a letter

dated February 6, 2002 from DDE to Wellman advising that she has been awarded variable pay

for 2001.

      4.      During her employment with DDE, Ms. Wellman was always supervised and

directed by DDE supervisors and managers, not employees of DuPont or Dow. I have reviewed

Ms. Wellman's complaint and charge of discrimination in this matter. Each of the individuals

she alleges as having engaged in discrimination or harassment were employees of DDE, not

DuPont or Dow. Specifically, DDE's human resource and payroll records reveal that Paul

Graves was employed by DDE from April 1, 1996 through June 30, 2005 and Mary Ann Price

was employed by DDE from April 1, 1996 through June 30, 2005.

      5.      Ultimately, Ms. Wellman was terminated from DDE for job abandonment. DDE

management, in consultation with DDE's Human Resources Department, made the decision to

terminate her employment. In making that decision, DDE personnel were guided by DDE

policies. DuPont was not consulted, nor informed of, any employment decisions regarding Ms.

Wellman. Attached hereto as Exhibit C is a copy of a letter dated August 26, 2002 terminating

**A73**

Ms. Wellman's employment at DDE for job abandonment. That letter is on DDE letterhead and is signed by me.

_Karen R. Cronin_

Subscribed and sworn to before me on this 29th day of August, 2007.

_Barbara J. Massie_
Notary Public

My commission expires: 7/28/2011

812035

BARBARA J. MASSIE
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires July 28, 2011

A74

# EXHIBIT A

reissue

FORM

**W-2** Wage and Tax Statement 1996

Copy 1 To be filed with employee's state, city or local income tax return

DUPONT DOW ELASTOMERS LLC
1007 MARKET STREET
WILMINGTON, DE 19898

DEBRA-ANN MELLMAN
PO BOX 4395
WILMINGTON, DE 19807-0395

| | |
|---|---|
| 4 Social security wages | 29974.20 |
| 5 Medicare wages and tips | 29974.20 |
| 6 Medicare tax withheld | 434.63 |
| 2 Federal income tax withheld | 1858.40 |

11 Nonqualified plans

13 See Instrs. for Box 13
C NONE
D NONE
P NONE

| 16 State | 17 State wages, tips, etc. | 18 State income Tax |
|---|---|---|
| DE | 29974.20 | |
| 1-51037-1420 | | 1223.21 |

Dept. of the Treasury-Internal Revenue Service

---

reissue

FORM

**W-2** Wage and Tax Statement 1996

Copy C For employee's records

DUPONT DOW ELASTOMERS LLC
1007 MARKET STREET
WILMINGTON, DE 19898

DEBRA-ANN MELLMAN
PO BOX 4395
WILMINGTON, DE 19807-0395

| | |
|---|---|
| 4 Social security wages | 29974.20 |
| 5 Medicare wages and tips | 29974.20 |
| 6 Medicare tax withheld | 434.63 |
| 2 Federal income tax withheld | 1858.40 |

11 Nonqualified plans

13 See Instrs. for Box 13
C NONE
D NONE
P NONE

| 16 State | 17 State wages, tips, etc. | 18 State income Tax |
|---|---|---|
| DE | 29974.20 | |
| 1-51037-1420-00 | | 1223.21 |

Dept. of the Treasury-Internal Revenue Service

REDACTED

A76



DuPont Dow Elastomers L.L.C., Wilmington, Delaware 19898
STATEMENT OF EARNINGS FOR
DEBRA ANN HELLMAN

**REDACTED**

NON NEGOTIABLE

# EXHIBIT B

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



# DuPont Dow elastomers

February 6, 2002

DEBRA-ANN WELLMAN

I am pleased to inform you that you have been awarded $1,611.19 in Variable Pay for 2001. This component of your total compensation is directly correlated to the success of DuPont Dow Elastomers, as measured against metrics specific to our Variable Pay Plan.

As Theo detailed in his recent Pen, 2001 was a challenging year in many ways. However, through collective global cost reductions, we contributed to favorable Net Cash Flow performance and, most importantly, we met our stretch Responsible Care metrics which earned us an additional 5% for Variable Pay. The company payout factor is therefore 49% of 2001 Targets.

At Tralee Park, we were successful in delivering on the site metrics we chose in support of 2001 Corporate Accountabilities and Kalrez®, at your service. The combination of corporate performance plus Tralee Park LOS metric performance (Yield, On-Time Delivery, Attendance at Safety Meetings and CBT Completion) gave us a 56% payout factor. This means a 15% greater payout than we would have earned without LOS!

Your award will be processed in the same manner as your regular paycheck and paid on Friday, February 15.

The success of our Company depends on the individual contribution of every employee. Thank you for your contribution. We look forward to a successful 2002!

Sincerely,

A79

# EXHIBIT C

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



# DuPont Dow elastomers

August 26, 2002

Ms. Debra-Ann Wellman
5 Twaddell Mill Road
Wilmington, DE 19807-1223

Dear Deb,

As a result of your failure to respond to our requests for verification of your continued disability and your failure to return to work, we are terminating your employment for job abandonment effective immediately.

In determining that you have chosen to abandon your job, we note that:

- you removed your personal effects from your office in February, 2002;
- an additional week of paid disability leave was provided to allow you more time to consult with your attorney concerning your options;
- during the pre-return to work meeting with the Employee Assistance Counselor and Human Resources Director on Tuesday, August 13, 2002, you confirmed your understanding of the options available to you and that the situation required immediate resolution. You were asked to appear for a return to work meeting scheduled for Friday, August 16, 2002 or you were to provide the Company with your desire to pursue an incapability pension (details including a pension calculation were provided to your attorney on July 19, 2002);
- in a fax from you received Friday, August 16, 2002, you stated you would make a decision on or before August 23, 2002;
- an additional week was provided after the conclusion of your paid disability leave to allow you time to, again, consult with your attorney concerning your options;
- you failed to appear for a return to work meeting on Friday, August 23, 2002 nor did you ask the Company to apply for an incapability pension on your behalf;
- your therapist has informed the Employee Assistance Counselor that you cancelled your most recent session;
- you have stopped making yourself available to the Employee Assistance Counselor;
- in a voice message left for the Employee Assistance Counselor on Saturday, August 24, 2002, you stated your unwillingness to return to work; and
- you failed to appear for a return to work meeting on Monday, August 26, 2002.

A81

Debra-Ann Wellman
August 26, 2002
Page 2 of 2

You are asked to reconcile your American Express account within 30 days so that you receive all monies owed to you by the Company and DuPont Dow receives any reimbursements from you for personal expenses already paid by the Company.

You are also asked to return any company property, including computer, cell phone and/or any other tangible property that you have in your possession. You may make arrangements to do so by contacting me on 302.792.4211. If you have any remaining personal items in your office, you also make arrangements with me to obtain those items.

Within two weeks, you will receive information from DuPont Connection concerning your benefits including options for continuing your medical coverage under COBRA. Any accrued or banked vacation not taken as of today will be paid to you.

Deb, you are reminded that the proprietary information agreement you signed upon your employment with the Company remains in effect after termination  You are required to return all confidential information and all trade secret material you have obtained during your employment with DuPont Dow Elastomers and you are not to use or to divulge at any time any secret or confidential information of DuPont Dow Elastomers, without DuPont Dow Elastomers' consent.

Sincerely,

Karen R. Cronin
HR Consultant

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809

**DuPont Dow** elastomers

July 12, 2002

Ms. Debra-Ann Wellman
PO Box 4395
Wilmington, Delaware
19807

Dear Deb:

Some weeks ago you expressed interest in pursuing employment with the DuPont Company. To date, I have assisted your efforts by advising DuPont Human Resources that DuPont Dow Elastomers has no objection to your applying for positions within DuPont. I also offered to forward your resume and job applications directly to DuPont in response to several open positions in which you expressed interest when you stated you did not have access to a laptop to submit your information electronically.

Today your EAP counselor, Sonya Barham, advised us of your request that DuPont Dow Elastomers obtain a job for you within DuPont. This letter is to advise you that DuPont Dow Elastomers is a separate legal entity from DuPont and, as such, is not in a position to obtain employment for you within DuPont.

When DuPont Dow Elastomers was formed, the parent companies provided that joint venture employees should expect to make their careers within DuPont Dow Elastomers and not transfer back to Dow or DuPont. Dow and DuPont agreed not to offer employment to DuPont Dow Elastomers employees without first consulting with joint venture management and specified that such transfers should be rare. DuPont does not accept applications from DuPont Dow Elastomers employees for positions posted on DuPont's Career Connection job posting system and DuPont Dow Elastomers does not accept applications from DuPont employees for positions on DuPont Dow Elastomers' Career Net job posting system.

In a limited number of cases DuPont Dow Elastomers has non-objected to our employees accepting employment with DuPont in cases where our employee has been offered a position by DuPont. However, we do not have the authority to either create a job for you or to unilaterally place you in a position within DuPont. At your request, we have communicated DuPont Dow Elastomers' non-objection to your applying for positions within DuPont. We are also prepared to release you immediately from your position with DuPont Dow Elastomers should you secure a position within DuPont. That assistance is the limit of our capabilities.

Please let me know if you have any questions regarding this issue.

Sincerely yours,

A83

DuPont Dow Elastomers L.L.C.
300 Bellevue Parkway
Wilmington, DE 19809



# DuPont Dow elastomers

Debra-Ann Wellman
PO Box 4395
Wilmington, Delaware
19807

June 3, 2002

Dear Debra:

I'm sending you a copy of an electronic mail from Marilyn McDaniels because you've informed me you don't have access to your DuPont Dow computer. My concern is that you will not see this message until your return to work.

As you requested, I advised DuPont that you have permission to apply for the secretarial role in Engineering Polymers. However, it appears DuPont is not accepting applications for job posting EP2002002 from nonDuPont employees at this time. However, if you are interested in this role, you might want to send a hard copy cover letter and resume to the attention of Lynn M. Flaim (rather than trying to post electronically via Career Connections). That way, if the restriction is simply that non-DuPont employees cannot apply via Career Connections, it may be that you can be considered if you apply through a different path.

However, if the restriction is truly that only DuPont incumbents can fill these roles, than it seems they will not accept an application from any external candidate via any process.

Sincerely,

Catherine LaPenta

**A84**



AM

To:      Catherine A LaPenta/DDE/DuPont
cc:
Subject:  Re: Job Posting EP2002002

Kitty – fyi.

—————— Forwarded by Patricia D Bowhall/DDE/DuPont on 05/31/2002 08:50 AM ——————

From:    Marilyn McDaniels on 05/31/2002 08:40 AM
To:      Patricia D Bowhall/DDE/DuPont@DuPont
cc:
Subject:  Re: Job Posting EP2002002

Pat, at this point, we are not accepting applications from non-DuPont employees.  If that changes, I will
give you a call.
Thanks and best regards,
Marilyn
Patricia D Bowhall



AM

To:      Marilyn McDaniels/AE/DuPont@DuPont
cc:
Subject:  Re: Job Posting EP2002002

Hi Marilyn — are you accepting applications from non-DuPont employees for this posting and if so, how
should Deb apply?  Hope all is well with you.  Have a good weekend.


From: Marilyn McDaniels on 05/30/2002 04:33 PM


From:    Marilyn McDaniels on 05/30/2002 04:33 PM
To:      Debra A Wellman/DDE/DuPont@DuPont
cc:      Patricia D Bowhall/DDE/DuPont@DuPont
Subject:  Job Posting EP2002002


Debra,

In reviewing the applicants for the Secretary position in DuPont Engineering Polymers, I noticed your
application came through DuPont Career Connections.  Unfortunately, you MUST be a DuPont U.S.
Region full-service employee in order to submit a self-nomination through Career Connection. If you are
employed by a DuPont subsidiary, joint venture or contractor, or you work outside of the U.S. Region, you
may not self-nominate via Career Connection.

Good luck in your search.

Marilyn McDaniels
HR Specialist


A85

From:     Marilyn McDaniels on 06/03/2002 03:49 PM
To:       Catherine A LaPenta/DDE/DuPont@DuPont
cc:       Patricia D Bowhall/DDE/DuPont@DuPont, Lynn Flaim/AE/DuPont@DuPont
Subject:  Permission to Apply

Kitty:  Thank you for the note below giving Deb Wellman permission to apply.  In the event that we open
this position up to joint-venture employees, I will notify Pat Bowhall.

Marilyn McDaniels
Lynn Flaim



Lynn Flaim
06/03/2002 02:34 PM

————————— Forwarded by Lynn Flaim/AE/DuPont on 06/03/2002 02:33 PM —————————



Catherine A LaPenta
06/03/2002 02:19 PM

To:       Lynn Flaim/AE/DuPont@DuPont
cc:
Subject:  Permission to Apply

Lynn: I'm the Director of HR for the joint-venture DuPont Dow. Under the joint-venture agreement, both
DuPont and DuPont Dow HR must give a "non-object" when someone from either Company wishes to be
employed by the other. This is to inform you that Deb Wellman has permission to apply for the
EP2002002 position in the event DuPont does determine it will accept applications from non-DuPont
employees for this role. Thank you.

Kitty LaPenta

A86

# PAGE

# REDACTED



**Catherine A LaPenta**
04/29/2002 04:14 PM

To:     Michael E Sherman/AE/DuPont@DuPont
cc:
Subject:   DuPont Dow/permission

Michael—just so we are all on the same page, I am forwarding this note to you. I sent a similar note to Kelli Kukura for the other position in which DW had expressed an interest.

I have left a voice mail message for Deb (today 4:00) asking her to call me so that I can verify she needs to send hardcopy, i.e. DuPont won't take her application through the electronic Career Connection.

KLP

—————— Forwarded by Catherine A LaPenta/DDE/DuPont on 04/29/2002 04:12 PM ——————



**Catherine A LaPenta**
04/29/2002 04:11 PM

To:     Helga H Needes/AE/DuPont@DuPont
cc:
Subject:   DuPont Dow/permission

Hello Helga: I am the Director of Human Resources for DuPont Dow, the joint venture. A part of the joint venture agreement requires that each company has to give permission to the other before an employee can apply for posted positions. This is to verify that Deb Wellman has received permission to apply for job number ELEC2002005, executive assistant. This is not a request for an interview or any other preferential treatment—only to verify that she is permitted to apply and can be considered along with other candidates.

Sandra Po, DuPont Staffing, informs me that Deb Wellman cannot apply through the electronic Career Connections, therefore I will be informing Deb Wellman that she must submit hard copy letter and resume to your attention. Thank you. My number is 302-792-4210 if you must verify this e-mail.

A88

# PAGE

# REDACTED

PAGE

REDACTED

# PAGE REDACTED

# PAGE
# REDACTED

Debra-Ann Wellman                                                    December 6, 2006
                            Wilmington, DE

                                                                      Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3                        —    —    —

4      DEBRA-ANN WELLMAN,                    :

5                                     : Civil Action

6          Plaintiff,                 : No. 05-279 SLR

7                                     :

8              vs.                    :

9                                     : TRIAL BY JURY OF 12

10     THE DUPONT COMPANY,             :

11                                    :

12         Defendant.                 :

13                        —    —    —

14                    Deposition of DEBRA-ANN WELLMAN,

15     taken pursuant to notice before Gail Inghram Verbano,

16     CSR, RMR, in the law offices of Potter Anderson &

17     Corroon LLP, Hercules Plaza, 1313 Market Street, 6th

18     Floor, Wilmington, Delaware 19899-0951, on Wednesday,

19     December 6, 2006, beginning at approximately

20     9:42 a.m.

21

22

23

24

25                                                          **A93**

Debra-Ann Wellman                                                   December 6, 2006
                          Wilmington, DE

Page 4

1              DEBRA-ANN WELLMAN, having first

2    been duly sworn according to law, was examined and

3    testified as follows:

4                   -    -    -

5                      EXAMINATION

6              (Wellman Exhibit No. 1 was

7              pre-marked for identification.)

8    BY MS. DiLUZIO:

9         Q    Good morning, Ms. Wellman.  My name is

10   Sarah DiLuzio.  I represent E. I. DuPont deNemours &

11   Company in the action you filed against them.  Just

12   for ease of reference throughout the deposition, I'll

13   refer to E.I. DuPont deNemours and Company as

14   "DuPont" or "the DuPont Company."

15        A    Okay.

16        Q    Will you please do the same?

17        A    I will.

18        Q    In your complaint against DuPont you

19   allege that you were subjected to sexual harassment,

20   and you identify specific incidents that allegedly

21   occurred during the years 2001 and 2002.  Is that

22   correct?

23        A    Yes.

24        Q    And for whom were you employed during

25   that time period?

A94

Debra-Ann Wellman

December 6, 2006

Wilmington, DE

Page 5

```
 1          A    DuPont Dow Elastomers.  It's a -- it was
 2     a limited liability corporation between the DuPont
 3     Company and the Dow Chemical company.
 4          Q    So the official title of your employer
 5     was DuPont Dow Elastomers, LLC; is that correct?
 6          A    That is correct.
 7          Q    And for ease of reference, I'm going to
 8     refer to them as either DDE or DuPont Dow.  Okay?
 9          A    I'll understand that.
10          Q    Okay, great.
11               Now, you've also filed lawsuits
12     against DDE and also against the Dow Chemical
13     Company; is that correct?
14          A    That's correct.
15          Q    Okay.  And also for the Dow Chemical
16     Company, I will just refer to them as "Dow"; okay?
17          A    Yes.
18          Q    Okay.  Now, Ms. Wellman, you have been
19     deposed before; correct?
20          A    Just the other day.  I know you were at
21     one portion of it.
22          Q    Okay.  So you're familiar with the
23     process.  I'll ask you questions, and you'll need to
24     give me verbal responses based on your best
25     recollection of events.  Okay?
```

A95

Page 19

1    move to Massachusetts and I don't want to waste these

2    people's time, and -- I don't want to move to

3    Massachusetts.  And then what do I have?

4                    And I think maybe she gave me, you

5    know, a day here and a day there to keep me -- it was

6    better, because they were going to go through the

7    whole transition.  Then you were -- you know, this is

8    what we offer.

9                    And instead of me wasting their

10    time, my gut instinct was, You're not going to move

11    to Boston, Deb.  Don't go sit in those seminars.

12    These folks are nice, but let them get someone else

13    in here, because I wanted to stay with -- you know, I

14    wanted to contribute to my pension, my years of

15    service.  I wanted to be functional.  I lived not far

16    from here.  I didn't want to go.

17        Q    Okay.  So you stayed with DuPont.

18                    When you moved to the DuPont

19    Elastomers --

20        A    On the 13th floor --

21        Q    -- business unit --

22        A    -- of the DuPont building.

23        Q    -- who was your supervisor there?

24        A    Nancy Harton.

25                    And that was marketing

**A96**

Page 20

1    communications secretary/assistant type of job.

2          Q    And what did you do in that job?

3          A    We did all the -- all the literature, all

4    the press releases, all the newsletters.  Anything on

5    a public relations type of level.

6                     All the promotional videos to the

7    plants, like to make sure that they heard the same

8    message.  If there were large meetings held, they

9    were videotaped and then these things would be sent

10   out to the plants so that those folks knew what was

11   going on at all times.

12                    I didn't know at that point in time

13   that there was a joint venture coming up.

14         Q    Sure.  Was your salary, when you moved to

15   the DuPont Elastomers business unit within DuPont,

16   the same as it was at DuPont Forum, did you receive

17   an increase?

18         A    I think Nancy's job was an increase.  I

19   can't remember quite how much her job -- I maybe had

20   some overtime with the DuPont Forum people, because

21   that was still a busy area.  But Nancy was -- we

22   worked weekends and things together and got her all

23   straightened out.

24                    So hourlywise, I maybe didn't get

25   an increase, but I got an increase because of

A97

1    this technology.

2                    And then all of a sudden it turned

3    into, because the Dow Chemical Company paid such a

4    large amount of money for DuPont to do this, it

5    turned into a -- where you brought folks in from Dow

6    Chemical Company to manage their product lines and

7    things like that.

8                    So I want to say mid '95.

9        Q    Was it discussed with you that some

10   DuPont employees would have the option of

11   transferring to DDE?

12       A    We never knew who was going to get the

13   letter or, when the envelope came, what the letter

14   would say; that you've been offered a job or you

15   haven't been offered a job.  Some people came and

16   some people didn't.

17                   And that came from HR.  In those

18   town hall meetings and in those brown bag lunch kind

19   of meetings, they would just talk about what an

20   excitement this is for -- potential excitement this

21   is to bring on this product -- Insite technology,

22   that it could enhance these older Elastomers

23   products.

24       Q    Okay.  So in mid 1995, DuPont started

25   having town hall meetings and brown bag lunches to

Debra-Ann Wellman                                                      December 6, 2006
                                Wilmington, DE

                                                                      Page 24

1    discuss with its employees the formation of the joint

2    venture?

3        A    No.  I had to proofread things that Nancy

4    was writing for Don Duncan, who was the senior

5    director of DuPont Elastomers.

6                So I thought you wanted to know

7    when I knew.  When did I officially know?  Probably

8    last quarter of '95, although brown bag lunches came

9    and --

10       Q    And it was officially announced that

11   there would be a joint venture between the Dow

12   Chemical Company and DuPont?

13       A    Not until April 1st, 1996.  It was so

14   up in the air how they were going to do this, whether

15   it was just going to be, Let us work on this

16   technology or, Oh, my goodness now we're bringing in

17   all these people.

18                And it was -- we had a press

19   release and an announcement for every possible

20   situation, because it was just -- until the last

21   second -- nothing was final until it was final.

22       Q    Okay.  So DDE was officially formed in

23   April of 1996.

24       A    Right.

25       Q    And at that point, you voluntarily

Page 25

1    resigned your employment with DuPont and became an

2    employee of DDE; is that correct?

3        A    I called Joan Capriotti -- I'm not saying

4    I had a terrible feeling, but -- there was just a lot

5    of buzz around whether this was ever really going to

6    fly.  And I asked her my options to find something

7    back in DuPont.

8                And she -- she pressed that -- she

9    goes, You know, Deb, they need people like you;

10   you're a high-producer, energetic.  You know, try it.

11   I can bring you back in if you want.

12       Q    When was this call with Joan Capriotti?

13       A    It was before I had to sign the document.

14   So the documents were given maybe in -- you probably

15   have one.  It was just -- it was maybe a month or so

16   before.

17       Q    Okay.  I don't know what document you're

18   referring to, Ms. Wellman.  So if you could --

19       A    Well, I just meant -- you signed a letter

20   and you said, Yes, I'm coming.

21       Q    To DDE?

22       A    Yes.  And whatever that was dated -- you

23   know, I went back out.  We also went to Kirk Young,

24   Glen Boyer, Bob Williams, Patty Michelle.  And I

25   said, Guys, look for something for me.  I don't

Debra-Ann Wellman

Wilmington, DE

December 6, 2006

Page 29

1    BY MS. DiLUZIO:

2        Q    Ms. Wellman, do you recall when you

3    received that letter?

4        A    They came about -- very short turnaround.

5    Even though you knew about it, very short turnaround.

6    It came about a month or three weeks before the

7    April 1st -- let's go back as far as two months,

8    maybe.

9        Q    So February or March of 1996?

10       A    Right.  But very, very short turnaround.

11   Like, you know --

12       Q    As far as what your decision was going to

13   be?

14       A    Yes.  Yes.

15       Q    Okay.  And did the letter come from

16   DuPont or did it come from DDE?

17       A    It came from Robert Cook, who he -- well,

18   see, they were -- DuPont -- I'm not sure at that

19   time, Sarah, if the DuPont logo was up here or down

20   here and the DDE logo was up here.

21             But somehow -- you know, I mean, it

22   was you severing from your parent company.

23       Q    Okay.  Do you recall giving testimony

24   that -- in a prior deposition with Mr. Willoughby,

25   that you went to DDE because it was an opportunity to

Debra-Ann-Wellman
December 6, 2006

Wilmington, DE

Page 31

1      A    Yes.

2      Q    So you were aware then that you were

3    terminating your document with DuPont and becoming a

4    DDE employee?

5      A    We were aware that we were a joint

6    venture held by those two parent companies.

7      Q    Which two --

8      A    The DuPont Company and the Dow Chemical

9    Company.

10            Everything -- you know -- and I

11    know that Mr. Willoughby brought this up.  You know,

12    your medical card said DuPont on it.  You still

13    received the DuPont magazine.  My pension would --

14    you know, everything stayed the same for so very

15    long.  They didn't turn over anything very quickly.

16      Q    From whom did you receive a paycheck

17    after April of 1996?

18      A    From DuPont Dow Elastomers.

19      Q    Okay.  Not E.I. DuPont; right?

20      A    No, huh-uh.

21      Q    Was it ever explained to you in these

22    town meetings or brown bag lunches that if you became

23    a DDE employee, it was expected that you would make

24    your career with DDE?

25      A    Oh, I'm sure they didn't want people to

Debra-Ann Wellman

December 6, 2006

Wilmington, DE

1    leave.  But it was asked whether -- and I'm sure

2    there's Q and As that went that can be retrieved,

3    like what would happen.  I mean, many people went

4    back to both companies, both DuPont and to Dow.

5          Q    From DDE?

6          A    Yes, from DDE.

7          Q    And so you're saying many people left

8    employment with DDE and returned to either DuPont or

9    the Dow Chemical Company?

10         A    Right.  Six months, a year, two years

11   after, they flowed back.

12         Q    Can you identify those DuPont employees?

13         A    I can give you some names of folks that

14   did have that happen.

15         Q    Please do.

16         A    Lynn Stanton.  John Dowd.  These are just

17   some.  The EEOC has a bunch of names that went back

18   so you can retrieve those documents.  I don't have

19   those.

20                    Sally Thayer.

21                    Everything -- because so many

22   people were going back and -- and the ship was

23   rocking.  These people would disappear.

24                    We used to see -- there was a place

25   on the web page where, you know, people got a new job

Debra-Ann Wellman

Wilmington, DE

December 6, 2006

Page 34

1    April 1996, what was your first position?

2         A    I was with Nancy Harton in that same

3    position.

4         Q    Ms. Harton also went to DDE?

5         A    Yes.

6         Q    So your day-to-day job duties did not

7    change?  You continued to be Ms. Harton's secretary

8    and helping her with marketing?

9         A    Katherine Branchioli (phonetic) came on.

10   And she took on a higher senior position in marketing

11   communications.  And she reported to -- they all

12   reported to Chris Pappas.  And I guess overall, I

13   would have reported to Chris Pappas.

14        Q    So would you say Kathy Branchioli was

15   your supervisor at that time, or Nancy was still your

16   supervisor?

17        A    Nancy was still my supervisor.

18        Q    And how long were you in that role?

19        A    Not very long.  A couple of months,

20   maybe.  Once Chris Pappas came on, he moved me out of

21   there.

22        Q    And where did you move to?

23        A    I moved to a position in purchasing.

24        Q    Was it a secretarial position?

25        A    Uh-huh.  Purchasing associate,

Debra-Ann Wellman

December 6, 2006

Wilmington, DE

Page 35

1    secretarial.

2        Q    Who did you report to in that role?

3        A    Charles Wardlaw, Frederick Rodammer.

4    Charles Wardlaw was from the DuPont Company.

5    Frederick Rodammer was from the Dow Chemical Company.

6            Usually all these subdivisions --

7    purchasing, finance, sales -- there was a DuPont

8    person and a DuPont person managing.

9        Q    But at this point, you were all DDE

10   employees; correct?

11       A    You had to be there.  It was all "we" and

12   "they."  You had to be there.

13       Q    But were you all DDE employees?

14       A    Oh, but please, you're preaching to the

15   choir.  You should have been there.

16            We were Dow, and the other people

17   was DuPont.  It was very confusing.  Whether the

18   paycheck said the little star and DDE or not.

19       Q    Okay.  But I'm not sure that you're

20   answering my question.

21            Were you and the employees to whom

22   you reported, Mr. Wardlaw and Mr. Rodammer, DDE

23   employees?

24       A    Yes.

25       Q    Okay.  And how long were you in that

Debra-Ann Wellman                                              December 6, 2006
                          Wilmington, DE

                                                        Page 37

1      that I was not permitted to say, per the request of

2      Mr. Pappas.  Since Mr. Duncan wanted to keep me on,

3      that I would not be permitted to say certain words in

4      that one-year time frame.

5                        Mr. Pappas used to come down and

6      bait me to get me into conversations to say those

7      words.  Tom Addison knew what he was doing, and I had

8      buzzers underneath my desk in the reception area, and

9      I could buzz to have somebody come up and help me.

10          Q    Chris Pappas was the marketing VP for

11     DDE; correct?

12          A    Right.  Previous Dow employee.

13          Q    But at that time, in 1996, he was DDE's

14     marketing VP?

15          A    Right.

16          Q    And Mr. Duncan, who was he?

17          A    He was the president.

18          Q    Of DDE?

19          A    Right.

20          Q    And Mr. Addison?

21          A    Was the plant manager of Kalrez.

22          Q    Also of DDE?

23          A    Kalrez hadn't come over yet.  Kalrez was

24     still a DuPont product.  It had a DuPont sign out

25     front.  The signage didn't change.  Nothing had

Debra-Ann Wellman

December 6, 2006

Wilmington, DE

Page 41

1    of Kalrez.

2        Q    Okay.  And who is Doris Stewart?

3        A    Doris Stewart was a secretary, and she

4    retired.

5        Q    And who did she report to and who did you

6    then report to?

7        A    I was still reporting to Kathy Phillips

8    and Tom Addison at the time.  Doris reported to Alex

9    Bonfante.

10       Q    So both with the Kalrez product group and

11   when you moved to Delaware Technology park you

12   continued to report to Kathy Phillips and Tom

13   Addison?

14       A    To DDP, no.  Then I'm with Alex Bonfante

15   and Jim McLaughlin.

16       Q    Kathy Phillips, Tom Addison.  What was

17   Kathy Phillips' position?

18       A    She's HR for that plant site.

19       Q    For DDE?

20       A    For DDE.

21       Q    Tom Addison, I think we've already talked

22   about him.  He was the plant manager?

23       A    Yes.

24       Q    And he was also a DDE employee?

25       A    When they were DDE -- they were turned

Alderson Reporting Company
1-800-FOR-DEPO

Debra-Ann Wellman                                          December 6, 2006
                        Wilmington, DE

                                                              Page 42

1    over to DDE employees whenever Kalrez -- whenever

2    that product line was totally brought in, whenever

3    the signage was changed and all there stuff.

4         Q    During this period of time, Ms. Wellman,

5    did you remain a DDE employee?

6         A    Oh, yes.

7         Q    Okay.  Alex Bonfante, who you reported to

8    when you moved to Delaware Technology Park, was he

9    also a DDE employee?

10        A    Yes.  He was up at the corporate center.

11        Q    And what was his position?

12        A    Business, slash, sales manager.

13        Q    So when you moved to Delaware Technology

14   Park, you were in a secretarial role helping out

15   sales managers?

16        A    I supported him.  He was the boss.  And

17   then I still did all the overflow, all of the prep

18   work and things like that for the incentive program

19   things.

20        Q    Okay.  And what was the incentive

21   program?

22        A    The incentive program is where you take

23   distributors on an incentive trip, or you reward them

24   during the year for meeting certain sales quota.

25             The distributors are not DuPont or

Page 43

1    Dow or DDE employees.  They're --

2            Q     They were third-party vendors?

3            A     Yes, they are.

4            Q     But the incentive program was a program

5    DDE ran to award distributors who did a good job?

6            A     Exactly.

7            Q     Okay.  And how long were you at Delaware

8    Technology Park in that role?  At this point, we're

9    talking you moved to Delaware Technology in about

10   '98; right?

11           A     Well, up until Paul Graves came, really.

12           Q     And that was when?

13           A     He came in in July or June of 2001.  But

14   my job kept on growing, because people were leaving.

15           Q     Okay.  Now, did you stay at Delaware

16   Technology park then until the end of your employment

17   with DDE?

18           A     Yes, I did.

19           Q     And when, in fact, did your employment

20   with DDE terminate?

21           A     They sent me a termination letter on

22   the -- the FedEx arrived on the 26th of August.

23           Q     And that was 2002?

24           A     Yes.

25           Q     So you were involuntarily terminated from

Page 44

1    DDE?

2         A    Yes, I was.

3         Q    Who did you report to at DDE after Alex

4    Bonfante?

5         A    Then the Dow people came down.  Presently

6    I'm surrounded all -- just to give you some

7    background, I'm surrounded all by DuPont people.  I'm

8    fine.  I'm not being harassed.  I'm not being kicked

9    around.

10                   Then Rick Bond comes.  Dan Haas

11   comes.

12        Q    What is that?

13        A    That's when I go over to Alex.  And they

14   stay at Tralee Park, but we have to interact with

15   them.

16        Q    So this is when you first went to

17   Delaware Technology Park?

18        A    Yeah.  And Alex was very supportive and

19   very protective of -- not only me but people in

20   general and could -- could smell something out even

21   then.

22        Q    So Alex Bonfante was still your

23   supervisor at that time?

24        A    Right.

25        Q    But you had some interactions with

1    Technology Park was coordinating with the

2    distributors?

3          A    Oh, yeah.  I had to do -- yes.

4          Q    Okay.

5          A    Yeah, I had all of that interaction with

6    them.

7                    The job -- did they ever show you

8    what my job title -- my job description --

9          Q    What was your job title?

10         A    Well, it was like three.  It was like the

11   admin for the business sales manager; the incentive

12   program manager; and the distributor programs

13   manager.  Plus then I managed the entire office at

14   Suite 400.

15                   So, you know, I had a lot of

16   responsibilities.  A got a full level promotion to go

17   over there with Alex.  A full level promotion.

18         Q    Okay.

19         A    Very, very nice increase.

20                   Kalrez made a bucket of money.

21   They were paid -- everybody in the plant, everywhere

22   was paid at a much higher level.  And it was very

23   nice.  Nobody could trick me into saying all those

24   words that they wrote down that I wasn't permitted to

25   say.  I didn't slip up, you know, much to the Dow

Debra-Ann Wellman                                          December 6, 2006
                            Wilmington, DE

Page 50

1          A     End of 1999.

2          Q     So at the time Mr. Smith came in and

3     became your supervisor, he was a DDE employee;

4     correct?

5          A     Right.  Ex-DuPont.

6          Q     Okay.  And then at the end of 1999, he

7     left that role; is that correct?

8          A     This is to the best of my knowledge.

9     Don't quote me on these.

10         Q     This is what I want, is your best

11    recollection, Ms. Wellman.

12         A     Okay.  Okay.  These were very short time

13    frames.  Bonfante, Bond, Smith, Metaxas, Pappas.  It

14    just -- you know.

15         Q     Okay.  When you say there was a voluntary

16    termination package that went out at the end of '99,

17    to your best recollection --

18         A     Right.

19         Q     -- were you offered that package?

20         A     Everybody was.  Everybody was.

21         Q     And did you take it?

22         A     No, huh-uh.  The amount of money that I

23    would have gotten was -- was -- they shouldn't have

24    wasted their paper.  I couldn't have survived even to

25    wait to go get another job.

                                              **A112**

Page 51

1        Q    So at the time of 1999, you had an

2   opportunity to resign from DDE, but you remained a

3   DDE employee; is that correct?

4        A    Exactly.

5        Q    Okay.  After Mr. Smith left, who then was

6   your supervisor?

7        A    Steve Metaxas, an ex-Dow employee.

8        Q    But at that time he was a DDE employee;

9   correct?

10        A    Yes.

11        Q    So you're still in the same role.  You're

12   still serving the admin role, the incentive program,

13   the distributor program; you just have different

14   supervisors; correct?

15        A    Yes.

16        Q    Okay.  So Mr. Metaxas comes in, best you

17   can guess, end of 1999.  How long does he stay your

18   supervisor?

19        A    Until Paul comes in.

20        Q    So you said that was June or July of '01.

21   So Steve was your supervisor for a year and a half?

22        A    Yeah, a little over a year.

23            But they took the job away from him

24   and nobody was in there at all for a while.  The

25   office was empty.

**A113**

```
 1              (Brief recess.)

 2   BY MS. DiLUZIO:

 3        Q    Okay, Ms. Wellman, actually I've handed

 4   your attorney what has already been marked as

 5   Exhibit 1.  I believe it is a copy of the complaint

 6   that you filed in this action.

 7        A    Yes.

 8        Q    Do you recognize that?

 9        A    That's my handwriting.  Yes.

10        Q    Okay.  Ms. Wellman, your complaint

11   alleges that you experienced discrimination and

12   retaliation that took place between July 2001 and

13   August 2002; is that correct?

14        A    Uh-huh.  There's other times, but that's

15   what this complaint is about.

16        Q    Okay.  And for whom were you employed

17   during that time frame?

18        A    DuPont Dow Elastomers, DDE.

19        Q    Okay.  We're going to walk through your

20   complaint and look at your specific allegations.

21        A    Okay.

22        Q    With respect -- if you look at the second

23   page of that document where you sort of outline your

24   allegations summarily, if you look at the first one,

25   you allege that you were discriminated against by
```

A114

Page 56

1    being sexually harassed.  Do you see that?

2         A    Yes, uh-huh.

3         Q    Can you please explain to me how DuPont

4    Company was involved in or responsible for the

5    alleged sexual harassment.

6         A    Oh, they're the parent company.

7         Q    Of whom?

8         A    Of DuPont Dow Elastomers.

9              DuPont Dow Elastomers never paid

10   any taxes.  They were just a conduit.  These two

11   parent companies split the profits and the expenses

12   50/50.  So it was just -- it was just above all,

13   floating above.

14             It was good on paper, but DuPont

15   and Dow were the parents of that company.  And

16   respectfully took on the profits and all the

17   expenses.

18        Q    Ms. Wellman, were you privy to the

19   documentation that occurred between DuPont and Dow

20   when they formed DDE?  Were you privy to those

21   documents?

22        A    No.  But in an accounting manner, Pam

23   Manascalco -- and I am -- it's a -- I don't know --

24   from finance, came and gave us -- I think I submitted

25   it, and I know I submitted it to the EEOC -- that

A115

Debra-Ann Wellman                                            December 6, 2006
                        Wilmington, DE

                                                            Page 61

1          A    No.  But we got the annual report from

2     DuPont.  And in there, most of the time DDE was

3     listed in the annual report.

4          Q    And when was that?

5          A    All the time.

6          Q    So as an employee -- I'm sorry.  Go

7     ahead.

8          A    I have a savings and investment plan.

9     They match my money.  I get that annual report from

10    that parent company because I buy its stock.

11         Q    Uh-huh.

12         A    So I read it when it arrives, and that's

13    how I know.  And also you know, we would have it as

14    reading material for employees, and I would display

15    it for employees to pick up and put it near their

16    inbox if they chose to take it if they didn't get it

17    at home.

18         Q    But you are not aware of the arrangements

19    between DuPont and Dow regarding the formation of

20    DDE, the specific financial arrangements?

21         A    Oh, no.  Oh, no.

22         Q    Okay.  So looking back to your complaint

23    and the allegation that you were subject to sexual

24    harassment while an employee of DDE, the sole reason

25    that you believe DuPont is responsible for that

Debra-Ann Wellman                                        December 6, 2006
                          Wilmington, DE

Page 62

1    sexual harassment is because they were part of the

2    joint venture?

3         A    They're my parent company, and that's how

4    we referred to them the entire time, every one of us.

5    If you came from DuPont, DuPont was your parent

6    company.  If you came from Dow, Dow was your parent

7    company.

8         Q    So despite the fact that you knew you

9    were an DDE employee, you knew you had terminated

10   your employment with DuPont, you continued to believe

11   that DuPont was responsible for the action of its DDE

12   employees?

13        A    It was all on paper.  It -- it never

14   panned out to where it was this separate entity.  It

15   was a joint venture.  It was a JV.  It was a

16   high-risk adventure.  And that's what venture means.

17   That's all it was.

18                   It was not a corporation standing

19   alone.  It did not -- there's no stock sold.  There

20   was no IOP (sic).  There's no -- it's not --

21        Q    And you know that how?

22        A    It never came out -- I would have bought

23   stock, especially for Kalrez.  I would have bought

24   stock.

25                   You know, it just -- it -- you

A117

Debra-Ann Wellman                                                    December 6, 2006
                          Wilmington, DE

                                                              Page 70

1     leveled at Mr. Paul Graves.  Is that accurate?

2          A    For this complaint, yeah.  I do have

3     background that other Dow employees were hostile and

4     aggressive and abusive towards me that I gave to

5     the -- to the EEOC.

6          Q    But for this complaint your allegations

7     are --

8          A    Yes.

9          Q    -- primarily about Mr. Graves?

10         A    Yeah.

11         Q    Okay.  And by whom was Mr. Graves

12    employed during this 2001 to 2002 time frame?

13         A    DDE.

14         Q    And who did Mr. Graves report to?  Do you

15    know who his supervisor or direct report was?

16         A    Bond.

17         Q    Rick Bond?

18         A    Uh-huh.

19         Q    And he was also a DDE employee?

20         A    Yes.

21         Q    Your next allegation is that you were

22    discriminated against by being given a poor

23    performance evaluation in, I believe, '01; is that

24    correct?

25         A    That's correct.                    **A118**

Page 71

1    Q    Who gave you that performance evaluation?

2    A    Mr. Paul Graves.

3    Q    And Mr. Graves' evaluation of your work

4    was for your work at DDE; correct?

5    A    That's correct.

6    Q    Did anyone else in DDE management have to

7    sign off on that review, or was anyone else at DDE

8    involved in that review?

9    A    It was he and I in that room.  Is that

10   what you mean?

11   Q    Okay.

12   A    (Witness nods head.)

13   Q    As far as input into your review, did

14   anyone other than Mr. Graves have input into your

15   review?

16   A    All of them do.  All of them do.  That's

17   why I was so shocked.

18   Q    Who was "all of them"?

19   A    My entire team.  The entire Kalrez -- all

20   the technical engineers, all the sales engineers, the

21   marketing, communications people, everybody.  He

22   probably -- you know, under normal conditions, I

23   would be solicited to see whether my peers that

24   worked at the plant, were they helpful to me too.

25              So I'm sure everybody -- that's why

A119

Debra-Ann Wellman                                          December 6, 2006
                        Wilmington, DE

                                                              Page 72

1    it was -- that many people don't not -- don't not

2    like me.  That many people.  I am -- I am too

3    conscientious and I have too many excellent

4    performance reviews to walk into that holocaust.

5    That was -- I don't know where that came from.

6          Q    So you had a -- let's say a poor

7    performance evaluation in '01 with Mr. Graves.

8          A    Right.

9          Q    Roughly how many people had input into

10   that evaluation?  When you say your whole team, how

11   many people is that?

12         A    At least 20.

13         Q    Of those 20 people, were any of those

14   folks DuPont employees?

15         A    No; it's folks that are working for

16   Kalrez.  No.

17         Q    So all DDE employees?

18         A    Yes.

19         Q    Okay.  With respect to your next

20   allegation, Ms. Wellman, that you were discriminated

21   against by being forced to work in a hostile

22   environment?

23         A    Yes.

24         Q    The environment, again, was Delaware

25   Technology Park; is that correct?

                                                       A120

Debra-Ann Wellman

December 6, 2006

Wilmington, DE

Page 73

1        A    Yes, it was.

2        Q    And that was DDE's site at that time?

3        A    No.  That's an ag chem DuPont site.  We

4    rented a suite from Dr. Tingey.  That's a DuPont

5    site.  Delaware Technology Park is a DuPont site.

6        Q    But the suite that you were in was DDE

7    employees?

8        A    No; there were DuPont employees in there

9    too.

10       Q    Okay.  In the same building?

11       A    In the same suite.

12       Q    In the same suite.  Okay.

13            The hostile environment that you

14   experienced at this time, as alleged in your

15   complaint --

16       A    Yes.

17       Q    -- how do you believe that DuPont Company

18   is responsible for that?

19       A    That I received that day from Paul, do I

20   think that DuPont has coached Paul to do that to me?

21   Is that what you mean?

22       Q    I want to know why it is that you believe

23   that the DuPont Company is responsible for any

24   alleged treatment you received or mistreatment you

25   received from Mr. Graves or anyone else at DDE.

**A121**

Page 74

1        A    I believe that that is my parent company

2    and that they have full -- full responsibility to

3    step in and not turn a blind eye ever to someone that

4    is reaching out to them for help.

5                I tried to work through this --

6    this gentleman and his obnoxious behavior to me was

7    the straw that broke the camel's back.  But from

8    1996, when I reported to DuPont finance that they

9    were cooking the books and they were fudging the

10   numbers, they had every right to look into this

11   stuff.  You don't hang somebody out to dry.

12       Q    Ms. Wellman, is it your belief that some

13   individual or any individuals at the DuPont Company

14   were aware of Mr. Graves' alleged treatment of you in

15   '01 and '02?

16       A    Oh, no.  He was -- you want to talk high

17   secret, big time.  Made sure he sent those engineers

18   that are in that building to a meeting over at Traley

19   Park while he had me in that room.  Oh, it was just

20   Mary Ann, he and I.  He orchestrated that.  No, I

21   don't.  No, I don't.

22                But when I reached out, I believe

23   that somebody should have stood up and helped me,

24   just stood up and helped me.  Either stopped the

25   abuse, get this guy some help.          **A122**

Page 89

1    your supervisor.  But I was trying to prep to -- you

2    know, see if -- if there was a possibility or if that

3    was a good job fit prior to that -- you know, before

4    I went and told one of the Dow people, because they

5    wouldn't let you go.  They weren't done with you yet.

6    They were carrying the baggage from Chris Pappas.

7         Q    Okay.  Other than your pursuit of jobs

8    with The DuPont Company, via DuPont Connections, did

9    you contact anyone in The DuPont Company's HR

10   department to complain of the treatment that you were

11   allegedly receiving at the hands of Mr. Graves during

12   '01 and '02?

13        A    I called EAP.

14        Q    And that was in February?

15        A    That was the first official DuPont

16   person.  You know, it wasn't -- it wasn't my goal to

17   create idle gossip and to say what was happening

18   there.

19                        I wanted to make a smooth exodus.

20   If these people want to act that way, fine.  I know

21   what's happening to me.  I need to move on.

22        Q    Okay.  Looking back to your complaint,

23   Ms. Wellman, when you alleged that you were being

24   forced -- you were forced to work in a hostile work

25   environment, which individuals -- who was responsible

Debra-Ann Wellman                                                December 6, 2006
                          Wilmington, DE

                                                                Page 90

1     to that hostile work environment, in your mind?

2          A     Mary Ann Price and Mr. Graves.  Yes.

3          Q     Okay.  With respect to your next

4     allegation, that you were discriminated against by

5     being forced to leave your position on disability,

6     can you tell me how it is that you believe DuPont

7     Company was responsible for your placement on

8     short-term disability?

9          A     DuPont doctor and a DuPont EAP counselor

10    pulled me off of that job.

11         Q     And what do you mean when you say that?

12         A     Just what I said.

13         Q     Well, can you explain to me how it came

14    about that you went on short-term disability.

15         A     They pulled me from that job.  Michael

16    Sherman, an EAP DuPont counselor, pulled me from that

17    job.

18                    Dr. Donald Cameron, after his

19    medical exam -- you know, you can't -- you can't work

20    under these conditions.  You can't.

21         Q     Ms. Wellman, were you aware that, by

22    virtue of a contract, a service agreement between The

23    DuPont Company and DDE, DuPont agreed to provide its

24    EAP counseling services to DDE employees and its

25    medical services to DDE employees?  Were you aware of

                                                                **A124**

Debra-Ann Wellman                                              December 6, 2006
                          Wilmington, DE

1   February of '02, were you disabled in any way?

2        A    If I was there with Paul, it was going

3   to -- he couldn't -- he couldn't stay away.  He

4   couldn't stay away.  He was going to get to the

5   bottom of what happened to Metaxas and why we weren't

6   buying the Insite technology -- and "we," I mean,

7   DuPont.

8        Q    So in answer to my question, you did not

9   believe that you were disabled in any way in February

10  of '02?

11       A    No.  I went there for counseling help.  I

12  thought I would walk through with somebody or

13  somebody could call him in.  Karen Cronin wouldn't

14  come down, and I didn't want to have any more

15  meetings with him, you know, since -- virtually since

16  July.  I didn't want to be in the room by myself with

17  him.

18                  He had progressively worn out his

19  welcome.  Totally invaded my comfort zone.  Violated

20  me on numerous occasions.  And it just -- it just got

21  old very quickly.

22                  He would not listen to me to -- to

23  stop this behavior.

24                  You're totally isolated.  He took

25  away -- I did the newsletter for the people at the

Debra-Ann Wellman

December 6, 2006

Wilmington, DE

Page 97

1      Q    Okay.  Thank you.

2                So on February 11th, 2002, in

3      your mind, what disability did you suffer from?

4      A    I was following their directions.  I was

5      stressed.  Stress, being abused on the job, sexual

6      harassment.  You know, toxic work environment.  I

7      never knew when -- when he would come swinging down

8      the hall again.

9      Q    Ms. Wellman, on February 11th, 2002,

10     were you physically capable of performing your job

11     duties?

12     A    You can't even ask that question.  Think

13     about that.  I have all that chaos.  I'm now being

14     interviewed -- now I'm being interviewed by doctors.

15     They're trying to seek help for me, and I'm trying to

16     be open-minded to take guidance.  And really what I

17     wanted was either move me someplace else, talk to

18     him, you know.  I even asked to move across the

19     street to Tralee Park.  I mean, you know, by that

20     time, he had beaten me to a pulp, yeah.

21     Q    But Ms. Wellman --

22     A    I couldn't do the job with him there;

23     right.

24     Q    Take Mr. Graves out of the equation.

25     Were you physically capable of performing your job

**A126**

Page 98

1    duties on February 11th, 2002?

2         A    If none of that stuff happened?

3         Q    If there was no Paul Graves.

4         A    Oh, my glory, yes.

5         Q    Thank you.

6         A    Yes.

7         Q    Okay.  Did you suffer from any mental

8    condition on February 11th, 2002, that would have

9    prevented you from performing your job duties at that

10   time?

11        A    Is fear a mental condition?  Is fear?

12        Q    Again, Ms. Wellman --

13        A    I don't know.

14        Q    -- let's assume that Mr. Graves was no

15   longer your supervisor.

16        A    No.

17        Q    Was there any mental condition that would

18   have prevented you from doing your job?

19        A    No, not at all.

20        Q    Thank you.

21             Could you have performed another

22   similar job at that time?

23        A    Yeah.

24        Q    Were you physically and mentally capable

25   of performing similar secretarial jobs at that point

A127

Debra-Ann Wellman
Wilmington, DE
December 6, 2006

Page 99

1    in time?

2        A    And Graves is not around?

3        Q    Any other secretarial jobs.

4        A    And Graves is not around, yes.

5        Q    Okay.  Thank you.

6                   With respect to your next

7    allegation of your complaint, that you allege you

8    were retaliated against because of the EEOC charge

9    you filed, when exactly did you file your EEOC

10   charge, ma'am?

11       A    The dates will say August the 18th.

12   But I went up there in -- I went -- since Karen

13   didn't take notes and she would not -- you know,

14   everything went over the top of her head.  She went

15   out on pregnancy leave.  I thought, if we have

16   another form of communication, to say it again,

17   everybody would then listen and know that I don't

18   want to be beat up anymore.  So --

19       Q    So that would be August?

20       A    So I run up there on May the 20th.  And

21   they know about it, because now I've retained Dick

22   Wier.  And Dick Wier has told DDE that she's gone up

23   to the EEOC.

24       Q    And that would be in May of '02; correct?

25       A    May 20th, 2002.                    **A128**

Page 115

1  saying, Well, why is this so choppy here?  And they

2  were crib notes for me to talk to from that.

3              Now, I did give a copy of that to

4  Dr. Glacken.  And he thought I gave a copy of that so

5  Dr. Glacken could treat me, but I gave that as a

6  courtesy copy, because that's what I had to talk to

7  Angela about.

8      Q    Okay.  But the purpose of that meeting,

9  you just told me, was to talk about your getting a

10 new EAP counselor?

11     A    Right.

12     Q    So was that when Sonya Barham was

13 assigned as your new EAP counselor?

14     A    Yes.  And she's at Chestnut Run.  Sonya

15     Q    Okay.  To the extent you haven't already

16 indicated, can you explain to me exactly why it is

17 that you think The DuPont Company was responsible for

18 any of these alleged incidents in your complaint that

19 you allege you were subjected to discrimination for.

20     A    They are my parent company.  They are

21 responsible for me.

22     Q    So that's the bottom line?

23     A    That's the bottom, top, in-between line.

24     Q    Okay.  There's no DuPont employee that

25 you allege participated in any of the sexual

**A129**

Page 116

```
 1    harassment that you feel you experienced?

 2         A    No.

 3         Q    Just to go over a few names -- I think

 4    most of the people you talked about in your

 5    complaint, Ms. Wellman, we've already discussed.  But

 6    let's just make sure we've discussed everyone.

 7              You, in your complaint, talked

 8    about a woman -- I believe her name is Nesha

 9    MacMurdo; is that correct?

10         A    Yes.

11         Q    And you just referenced her in reference

12    to an incident that allegedly occurred while you were

13    a DDE employee?

14         A    Yes.

15         Q    Was she also a DDE employee?

16         A    Correct.

17         Q    Was she a coworker?

18         A    No, huh-uh.  I would've -- she would have

19    been supported by the other AC in the group, which at

20    that point was Renee Carter.  And she's an ex-DuPont

21    person.

22         Q    Okay.  Are there any -- or can you name

23    for me any folks that you believe were witnesses to

24    your allegation of sexual harassment?

25         A    No.  Mr. -- no.  Mr. Graves was very
```

**A130**

Page 143

1    technology could take off and enhance DuPont

2    products.  When that was done, it was going to be

3    dissolved.

4         Q    So when you joined DDE and began

5    receiving paychecks from DDE in April of 1996, were

6    there any other benefits or incentives that you

7    received from DDE?

8         A    Well, no.  My health insurance card, my

9    co-pay card, my vision card all said "DuPont" on

10   them.  And I know you try to say, Well, they bought

11   that from them, but --

12        Q    Did DDE have a variable compensation

13   plan?

14        A    Yes.

15        Q    So it had its own variable compensation

16   plan?

17        A    Right.

18        Q    That was not tied to the performance of

19   the DuPont Company as a whole; is that right?

20        A    It would be applied to the business that

21   you were in, is how they structured it.

22             MS. DiLUZIO:  Could we mark this?

23   I think we're on 4.

24             (Wellman Exhibit No. 4 was marked

25             for identification.)

A131

Page 144

```
 1    BY MS. DiLUZIO:

 2           Q    Ms. Wellman, I've handed your counsel

 3    what's been marked Exhibit 4.  It looks like a letter

 4    dated February 6th, 2002, addressed to yourself,

 5    Debra-Ann Wellman.  Do you recognize this?

 6           A    Yes.

 7           Q    Thank you.  And what is it, ma'am?

 8           A    That year I got $1,600 as a bonus.

 9           Q    From DDE?

10           A    Yes.

11           Q    And that was measured against DDE's

12    performance in that business; is that right?

13           A    Not DDE's:  Kalrez.

14           Q    Which was a part of DDE?

15           A    Yes.

16           Q    Okay.

17           A    Did you want to know how I received it?

18           Q    No, ma'am.

19           A    Okay.

20           Q    Did DDE have its own employee handbook or

21    employee policies that you received?

22           A    No.

23           Q    None at all?

24           A    None at all.  We had DuPont policies and

25    procedures up there.  They never got very far.  They
```

1        Q     Less than 15?

2        A     I have no idea.  Because if someone was

3    nice and responsive, I would then continue to stay in

4    touch with them.  I think you can get a printout of,

5    you know, any phone calls that I made; and my log for

6    my emails.

7                     I would have done things like that.

8    I would have said, "Hi, how are you?  I'm still out

9    here, you know.  I noticed your job is still on the

10   board."

11       Q     What kind of response -- what kind of

12   responses did you receive from folks when you would

13   make these phone calls?

14       A     That they have to generally place

15   interdepartmentally.  They didn't say companywide,

16   but interdepartmentally.

17       Q     And is that why you did not take the

18   additional step of filling out the DuPont Connections

19   self-nomination form?

20       A     No.  Because you had to tell your

21   supervisor, and my supervisors from Dow would not

22   have given me permission.  "Why are you leaving?"  I

23   can hear it.

24       Q     So you knew you had to seek permission

25   from your department supervisors to nominate for a

**A133**

Debra-Ann-Wellman                                           December 6, 2006
                        Wilmington, DE

                                                            ` Page 152

1    position with the DuPont Company?

2         A    Right.  I needed to talk to them to build

3    the rapport, and then I can coordinate with -- "Look,

4    here's something really good for me.  Can I please

5    get out of here?"  You know, nothing surreptitious;

6    proactive type of behavior.  You know, I'm not there

7    to be kicked around.

8         Q    When did you first make a call to someone

9    at the DuPont Company, after your transition to DDE,

10   in which you sought employment back at DuPont?

11        A    I think I told you, once I got over the

12   probation time at, you know -- that the Dow people

13   put me on.

14        Q    So that would have been, what, 1997,

15   1998?

16        A    Yeah.

17        Q    So between -- let's say, '97, you went on

18   probation, November '96.  Let's say end of '97

19   through February of '02, when you went out on

20   short-term disability from DDE, in that time frame,

21   in that -- what's that -- five years, you made

22   between 10 and 20 calls to DuPont regarding jobs that

23   were posted?

24        A    These are cold calls of people that I do

25   not know.  I networked with the people I worked with

## CERTIFICATE OF SERVICE

I, Sarah Elizabeth DiLuzio, hereby certify this 31st day of August, 2007, that the foregoing **Defendant E. I. Du Pont De Nemours And Company's Appendix In Support Of Its Opening Brief In Support Of Its Motion For Summary Judgment** was electronically filed with U.S. District Court District of Delaware via CM/ECF (Official Court Electronic Document Filing System) which will send notification of such filing that the document is available for viewing and downloading via CM/ECF to the following counsel of record:

> John M. Stull (No. 568)
> 1300 North Market Street
> Suite 700
> P.O. Box 1947
> Wilmington, DE 19801
> Telephone:  (302) 654-0399
> Facsimile:  (302) 654-0884
> jstullesq@aol.com

> *Sarah E. DiLuzio*
> Sarah Elizabeth DiLuzio (Del. Bar #4085)
> Potter Anderson & Corroon, LLP
> Hercules Plaza, Sixth Floor
> 1313 N. Market Street
> P.O. Box 951
> Wilmington, DE  19899
> (302) 984-6042 (Telephone)
> (302) 658-1192 (Facsimile)
> sdiluzio@potteranderson.com (Email)

815727/20120-339
Public Version: September 4, 2007